

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00072-CV
_____

IN THE INTEREST OF V.K.H.H., A CHILD

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 19D0442-CCL

Before Morriss, C.J., Stevens and Carter,* JJ.
Opinion by Justice Carter

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# OPINION

After Mother and Father[1] filed competing petitions to modify the trial court's conservatorship order, the trial court held a hearing on the petitions and granted Father's petition. On appeal, Mother complains that the trial court abused its discretion by failing to award her primary custody of the child. Finding no abuse of discretion, we affirm the trial court's judgment.

## I.    Background

In their July 2019 final divorce decree, Mother and Father were appointed joint managing conservators of their three-year-old daughter, V.K.H.H. Father was accorded the exclusive right to designate V.K.H.H's residence within Bowie County.[2] Under the decree, V.K.H.H. lived with Father during the week and with Mother on the weekends. Holiday possession was divided between Mother and Father. In January 2020, Father filed a petition to modify the parent-child relationship, asking the trial court to modify the terms and conditions for access to, or possession of, V.K.H.H. in accordance with the standard possession order. Mother filed a counter-petition to modify the parent-child relationship, asking the trial court to name her as the person having the exclusive right to designate the primary residence of V.K.H.H. Mother's supporting affidavit claimed that V.K.H.H.'s present circumstances would significantly impair her physical health or emotional development. In connection with her counter-petition, Mother sought a child-custody

---

[1]To protect the child's identity, we refer to the child's parents as Mother and Father, and we refer to the child by initials. *See* TEX. R. APP. P. 9.8.

[2]The decree required both parties to submit to hair-follicle drug testing and enjoined both parties from the use of alcohol or drugs when V.K.H.H. was present or within forty-eight hours prior to possession of V.K.H.H. Father was required to obtain and use a SOBERLINK until further order of the court. In November 2019, the trial court entered its order discontinuing Father's requirement to use SOBERLINK.

evaluation. The trial court granted the motion and appointed Melissa Pierce to conduct the evaluation.[3]

Following a hearing in May 2021, the trial court entered its order finding that the modifications requested by Father were in V.K.H.H.'s best interest.[4] The order gave Father the exclusive right to designate V.K.H.H.'s primary residence without regard to geographic restriction and gave Mother the right to possession every other weekend, extended by Friday and Monday holidays; every Thursday during the school year for two hours in the evening; spring break in even-numbered years; and extended periods of summer possession. The order further granted Mother possession on alternating holidays.

## II. No Abuse of Discretion in Modification of Conservatorship Order

This case is governed by Section 156.101 of the Texas Family Code, which provides,

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of

---

[3]Under this order, Pierce was required to (1) evaluate the residence of each party seeking conservatorship, (2) observe V.K.H.H. with each adult who resided in a residence subject to evaluation, (3) review any other relevant information identified by the trial court, (4) obtain information from relevant collateral sources, (5) observe the child in the residence that was the subject of the evaluation, (6) consider criminal history of any person residing in the residence subject to evaluation, and (7) assess the relationship between the child and each party seeking possession of or access to the child. Pierce was then required to prepare a written report in accordance with Section 107.113 of the Texas Family Code, including findings and answers to the following questions: (1) which party should have the exclusive right to determine the primary residence of the child, (2) which party was best able to meet the emotional needs of the child, (3) which party was best able to meet the physical needs of the child, and (4) what was the nature and quality of parental communication between the parties?

[4]We abated this matter to the trial court for the issuance of findings of fact and conclusions of law supporting its final order. In accordance with our order, the trial court issued sixty-eight findings of fact and conclusions of law, many of which were mere recitations of the evidence presented at trial. *See In re Marriage of Grossnickle*, 115 S.W.3d 238, 253 (Tex. App.—Texarkana 2003, no pet.) (trial court need only enter findings on ultimate or controlling issues). Mother does not claim that the trial court's findings warrant reversal. *See Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("We may only reverse the trial court's judgment if the court made an erroneous finding on an ultimate fact issue; immaterial findings are harmless and are not grounds for reversal.").

conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:

> (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since . . . :

> > (A) the date of the rendition of the order . . . .

TEX. FAM. CODE ANN. § 156.101. Mother contends that the trial court (1) abused its discretion by modifying the conservatorship provisions of the divorce decree, because much of the evidence weighed entirely in favor of granting Mother managing conservatorship and the right to determine V.K.H.H.'s residence, and (2) failed to find changed circumstances justifying the modification order. Mother further contends that the record does not support a finding of changed circumstances.

## A. Material and Substantial Change in Circumstances

We first turn to Mother's second complaint—that the trial court failed to find a material and substantial change in circumstances since the previous order. *See* TEX. FAM. CODE ANN. § 156.101(a)(1). This issue lacks merit. The trial court's modification order specifically finds "that the circumstances of a conservator of the child have materially and substantially changed since the date of the rendition of the Order." To the extent that Mother complains that the evidence does not support such a finding, we disagree. In her counter-petition to modify the parent-child relationship, Mother alleged that "[t]he circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified." Mother's pleading that the circumstances of the parties had materially and substantially changed "constituted a judicial admission which

4

precludes [Mother] from asserting on appeal that there were no material and substantial changes in the circumstances of the parties since the 201[9] order." *In re N.V.R.*, No. 06-17-00023-CV, 2017 WL 3751525, at \*4 (Tex. App.—Texarkana Aug. 30, 2017, no pet.) (mem. op.). We overrule this point of error.

### B.    Hearing Evidence

As for Mother's first complaint, the evidence at the hearing reflected that Father was employed full-time and lived in Hooks, where his mother, and other family members, resided nearby. According to Father, V.K.H.H. spent time with those relatives on a daily basis, and it would be a shock to her if those relationships were removed. Father explained that he wanted to modify the conservatorship order because he did not have any quality time on the weekend with V.K.H.H. He further explained that co-parenting had been a battle and that he believed it was in V.K.H.H.'s best interest to spend some weekend time with him. V.K.H.H. was on a soccer team and had a swing set and a soccer goal in the backyard. Father also taught V.K.H.H. about gardening and kept her engaged by playing educational games with her. Father hired a tutor for V.K.H.H.—who was in kindergarten at the time of trial—so that she could get ahead in school.

Father stated that, if Mother were granted managing conservatorship with the right to determine V.K.H.H.'s residence, he believed V.K.H.H. would have to change schools, which he claimed would not be a positive change. Father also testified that Mother—who had since remarried—had a new baby and that, if V.K.H.H. lived there as well, the two-bedroom, one-bath house would be cramped. Father—who also had since remarried—lived with his wife (Stepmother) and V.K.H.H. in a four-bedroom home with two bathrooms on one-half of an acre.

5

At times, V.K.H.H had told Father that she wanted to live with Mother. According to Father, upon returning after a weekend with Mother, V.K.H.H. was sometimes very upset, and the child had even discovered a way to call Mother. Although V.K.H.H. loved Mother and wanted to spend more time with her, Father did not believe that was a good idea. According to Stepmother, V.K.H.H. got excited on Fridays when it was time to see Mother, but she had never seen V.K.H.H. upset because she missed Mother.

Father stated that he and Stepmother had a happy marriage and that V.K.H.H. respected and listened to Stepmother. Stepmother testified that she had an "absolutely perfect" relationship with V.K.H.H, who had embraced her as a mother figure. She admitted to leaving V.K.H.H. alone in a car on one occasion, as reflected in the home study, but explained that the time period was brief, the doors were locked, the car was left running, and V.K.H.H. was never out of her line of sight.

Pierce, who conducted the home study by order of the trial court, met with Mother at her home. She concluded that the house was appropriate and that V.K.H.H. and Mother's husband (Stepfather) had a good relationship and a close bond. Nothing about the home or Mother's interactions with V.K.H.H. was a cause of concern. Mother appeared to be truthful. Pierce also met with Father in his home, and there were some discrepancies in what he related to Pierce. There was a discrepancy about how often V.K.H.H. was staying with Father's sister (Aunt), and there was some discrepancy about an incident in which it had been alleged that Father was suicidal. Father denied being suicidal, but Aunt was concerned about it.

At the time of the home study, Mother was working, but her schedule was flexible. Pierce learned in her investigation that, if V.K.H.H. were to live with Mother, Mother would take her to school, pick her up from school, and otherwise care for her. Mother was also in a position to be able to quit her job if necessary.

Pierce stated that V.K.H.H. had a close bond with both parents but that the bond with Mother was very strong. Pierce also testified that V.K.H.H. was bonded to Stepfather. V.K.H.H. also had a strong bond with Father's mother (Grandmother). Even so, Pierce felt that V.K.H.H. needed to be with Mother for the majority of the time, with Father having standard visitation. Pierce also recommended mental-health treatment for some issues that had arisen with Father in connection with making recordings of women's "private parts." Father was forthcoming about the recordings and had made amends to some of the women he recorded. This was of great concern to Pierce.

Pierce was also concerned about Father's drinking and having been previously suicidal. She did not feel that Father was forthcoming about taking off from work without telling anyone and disappearing. Father was also not forthcoming about the fact that V.K.H.H. stayed with Aunt as often as she did.

According to Pierce, Mother was best able to provide a stable home for V.K.H.H., and Pierce believed that it was in V.K.H.H.'s best interest to live with Mother. Even though there was testimony that Mother manipulated V.K.H.H. and that Mother was unable to co-parent, that did not change Pierce's recommendation because that is not what she observed or what her

7

backup documentation showed.[5]  Although V.K.H.H. loved both parents, there was a special bond between Mother and V.K.H.H. that Pierce observed in the way that V.K.H.H. wanted to talk to Mother and in the way that Mother listened to her.[6]

Father testified that Pierce's home study contained "quite a few" inconsistencies and/or untruths.  Although the home study stated that Father was suicidal and that Father perhaps attempted suicide on one occasion, Father claimed that that statement was untrue.  Aunt denied that Father was ever suicidal.  According to Grandmother, it had been over two years since Father had consumed alcohol.

Other events alleged in the home study were likewise disputed.  The home study alleged that Father assaulted Mother in the driveway.  Father claimed that that statement was untrue and explained that, as he was trying to leave, Mother swung at him.  Father "wrapped her up," and that was the end of it.  Grandmother and Aunt echoed Father's version of this event.[7]  Father and Stepmother both claim that Mother had acted violently in the past.  Father testified that Mother once assaulted him in the parking lot of a local restaurant, and Stepmother claimed that Mother once assaulted her in the doorway of Father's apartment.  No police reports were filed.

Since July 2019, Mother had noticed changes in V.K.H.H.  While she was previously carefree and outgoing, she had become reserved.  According to Mother, V.K.H.H. began to stutter and suck her thumb.  Those things only became issues when V.K.H.H. was separated

---

[5]Pierce stated that both parents had been guilty of failing to co-parent in the past.

[6]Pierce testified that V.K.H.H. also needed counseling.

[7]Pierce had a discussion with Mother about the driveway incident, and Mother received counseling.

from Mother for so long. For those reasons, Mother believed that V.K.H.H. needed counseling.[8] V.K.H.H. was very attached to Mother and became visibly upset when Mother left her line of sight. At every exchange, V.K.H.H. became distraught. V.K.H.H. had called Mother many times crying and wanting to go home to Mother.

Mother testified that she would be staying at home and that it would be in V.K.H.H.'s best interest to award Mother primary custody. At the time of trial, Mother had a six-week-old baby and believed that her family would help her with anything she might need. Mother explained that she and Stepfather had added on to their home and that, as a result, it had three bedrooms, two baths, and a utility room. The house was situated on sixty acres of land with two ponds and woods. Mother's family, including her mother-in-law, sister-in-law, and brother-in-law, also lived on the acreage. V.K.H.H. had friends who lived nearby and regularly came over to play.

V.K.H.H. had indicated that she would like to go to school in Simms and that she got bullied by the children at her then-current school because she wore boy's clothes and smelled bad. V.K.H.H. had also been upset during the school day and had asked to take a photo to send to Mother. Mother had talked with V.K.H.H. about trying not to suck her thumb, but V.K.H.H. told Mother that, if she had the choice between being a big kid or a baby, she would be a baby because she would be with Mother every day.

Mother's sister testified that she noticed changes in V.K.H.H. after the divorce. V.K.H.H. always wanted to be right next to Mother. On one occasion when Mother and

---

[8]Father had not agreed to seek counseling for V.K.H.H.

V.K.H.H. visited Mother's sister in Rockwall, Mother went outside to retrieve their luggage, and V.K.H.H. began crying and convulsing and asking where Mother was. According to Mother's sister, Mother was a wonderful parent, and she was great with all kids.

According to Mother's mother-in-law (Mother-in-law) V.K.H.H was happy at Mother and Stepfather's home and had expressed unwillingness to return to Father's home after the weekend. Mother-in-law testified that Stepfather had a good relationship with V.K.H.H. and that V.K.H.H. and Mother had a very loving relationship. Mother cherished every moment of her time with V.K.H.H. and did not leave V.K.H.H. on the weekends. Mother-in-law testified that she believed it would be in V.K.H.H.'s best interest to spend more time with Mother.

Mother's father (Grandfather), who lived in Ohio, visited Mother three times in 2020. Since the divorce, Grandfather had noticed that V.K.H.H. stuttered, ate her hair, started sucking her thumb, and did not want to be away from Mother for any amount of time. Grandfather testified that V.K.H.H. had not exhibited that type of insecurity before the divorce. According to Grandfather, V.K.H.H. had expressed to him her sadness and desire to spend more time with Mother. Mother and V.K.H.H. had a stellar relationship, and Mother did a lot with V.K.H.H. to promote that relationship. Grandfather believed that V.K.H.H. should live with Mother for the majority of the time.

Grandmother testified that Mother loved V.K.H.H. but that the relationship was not a healthy one because Mother wanted to be V.K.H.H.'s friend. Grandmother believed that V.K.H.H. would be better off in a calm environment with Father and Stepmother rather than

spending more time with Mother. Grandmother described Stepmother as a strong woman with a calm personality.

If Mother were to be named primary managing conservator, Grandmother believed that Mother would not be flexible and would not act in V.K.H.H.'s best interest. According to Grandmother, Mother acted only in her own best interest. Although there were times that V.K.H.H. would cry when Mother dropped her off at Father's house on Monday, Grandmother stated that V.K.H.H. stopped crying as soon as she got in the house. V.K.H.H. had told Grandmother that she wanted more time with Mother. Grandmother testified that, although V.K.H.H. would like to spend more time with Mother, Mother could not provide a stable environment for V.K.H.H.

Aunt believed that Mother was manipulative, and she testified that, after spending the weekend with Mother, V.K.H.H. tended not to listen well and wanted only to get her way. Aunt testified that Father was very involved with V.K.H.H., loved her, and showed her compassion. Aunt testified that it was in V.K.H.H.'s best interest to live with Father.

### C. Standard of Review and Analysis

"We review the trial court's decision to modify conservatorship under an abuse of discretion standard." *In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "A trial court abuses its discretion only when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle." *Id.* (quoting *In re Marriage of Jeffries*, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701

11

S.W.2d 238, 241–42 (Tex. 1985))). "Under this standard, legal and factual sufficiency are not independent grounds for asserting error, but are relevant factors in determining whether the trial court abused its discretion." *Id.* "In determining whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion." *Id.* "We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Id.* (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting TEX. FAM. CODE ANN. § 153.002). "[C]onservatorship determinations are 'intensely fact driven.'" *Id.* (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). For this reason, "the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *Id.* (quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.*

The testimony in this case was highly controverted, with little room for middle ground. Having heard this testimony first-hand, the trial court was able to evaluate its merit based on the

demeanor and personalities of the witnesses. The trial court could thus discern much more from this controverted testimony than what is reflected in the cold record.

Based on the evidence, the trial court determined the following:

- "Mother and Father have done a poor job of co-parenting since the original order was entered by the court."

- "[V.K.H.H.] did not testify and was not asked to express to the Court her desires as to possession."

- "The emotional and physical needs of [the] Child are currently being met by Father and his family, who live nearby."

- "The proximity of Father's family offers support to Father in caring for [the] Child, as well as stability for [the] Child."

- "Father has a stable job which allows him to provide for [the] Child's needs."

- "[The] Child is able to attend after-school care until Father picks her up, which offers a stable and safe environment, so Father can work until 5:00."

- "Father's mother is available to care for [the] Child when she is out of school and Father has to work, which offers safety and stability for [the] Child while Father works."

- "Continuing at her current school offers stability for [the] Child."

- "If granted the ability to designate [the] Child's residence, Mother would transfer [the] Child to a new school."

- "[The] Child has exhibited behavior when she is with Mother that leads to questions about her emotional needs when she is with Mother."

- "The court weighed the credibility of the parties and their respective witnesses and determined that Father and his witnesses were more credible than Mother and her witnesses."

- "Based on [these] findings . . . , the Court finds that [it] is in the best interest of [the] Child for Father to continue to be the parent to designate [the] Child's

13

residence and for Mother to have standard visitation in order to provide [the] Child a stable schedule."

The trial court specifically found that Father and his witnesses were more credible than Mother and her witnesses. In its findings of fact and conclusions of law,[9] the trial court did not account for the fact that it discounted Pierce's testimony, a neutral witness who conducted the home study by order of the trial court.[10] Even so, the trial court was in the best position to judge and weigh all the evidence and resolve the conflicts in the evidence. Because "[a] trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function," the trial court's judgment will be reversed "only when it appears from the record as a whole that the court has abused its discretion." *In re J.J.R.S.*, 627 S.W.3d at 218. Giving due deference to the trial court as finder of fact, we cannot conclude that, based on the record as a whole, the trial court abused its discretion in deciding to grant Father's petition and to modify Mother's visitation rights in accordance with the standard visitation order.[11]

---

[9]As previously mentioned, the trial courts findings of fact and conclusions of law were primarily recitations of the evidence. "Findings of fact and conclusions of law" issued after a bench trial are "a judge's statement of the facts found to be true and the conclusions of law based on those facts." *Findings of fact and conclusions of law,* BLACK'S LAW DICTIONARY (11th ed. 2019).

[10]The home study was not offered into evidence. *See* TEX. FAM. CODE ANN. § 107.114(a).

[11]"There is a rebuttable presumption that the standard possession order provides the reasonable minimum level of possession and access for a parent named possessory conservator and is in the best interest of the child." *In re J.J.R.S.*, 627 S.W.3d at 218 (quoting TEX. FAM. CODE ANN. § 153.252).

## III. Conclusion

We affirm the trial court's order.

Jack Carter
Justice

Date Submitted:    April 22, 2022
Date Decided:      May 11, 2022